# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOLORES M. REID,         )

           )

    Plaintiff,         )     No. 09 C 6906

           )

      v.          )     Judge Edmond E. Chang

           )

MICHAEL J. ASTRUE,     )

Commissioner of Social Security,  )

           )

    Defendant.        )

## MEMORANDUM OPINION AND ORDER

Plaintiff Dolores Reid seeks judicial review of the Social Security Administration's (SSA) denial of disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423. Before the Court is Reid's motion for summary judgment seeking an award of benefits, or in the alternative, a remand for further proceedings. R. 14.[1] For the reasons stated below, Reid's motion is granted insofar as the denial is vacated and the case is remanded for further proceedings.

## I.

## A.

Reid filed for disability insurance benefits in September 2005, alleging that she became disabled on February 8, 1999. Tr. 65.[2] Reid's claim was denied initially in

_____

[1]Federal jurisdiction arises under 42 U.S.C. § 405(g).

[2]"Tr." refers to the administrative transcript filed on February 11, 2010. R. 13.

January 2006, and again denied upon reconsideration in April 2006. Tr. 60-61, 80, 88. In May 2006, Reid filed a timely written request for a hearing before an administrative law judge (ALJ). Tr. 93. On April 22, 2008, Reid, represented by counsel, appeared and testified before an ALJ. Tr. 17. A vocational expert (VE) was the only other witness who testified at the hearing. Tr. 49-58. In September 2008, the ALJ issued a written decision denying Reid's claim for benefits. Tr. 73. The SSA's Appeals Council denied Reid's request for review of the ALJ's decision on September 1, 2009, making the ALJ's decision the final decision of the Commissioner under 42 U.S.C. § 405(g). Tr. 2-4; 20 C.F.R. § 404.981. Thereafter, Reid requested an extension to respond to the Appeals Council's denial of review and timely filed her complaint with this Court on November 3, 2009. R. 1.

## B.

1. *Education and Work History*

Reid was born in 1960, and was 38 years old at the time of her alleged disability onset date. Tr. 24-25, 184. She is five feet and five inches tall and weighs approximately 180 pounds. Tr. 24. Academically, she did not progress beyond ninth or tenth grade and did not earn a GED. Tr. 24. From 1991 to 1992, Reid worked as a telemarketer. Tr. 190. From April 1996 to November 1998, Reid worked as a bartender and cashier at Land Oak Liquors. Tr. 25, 199. In 2000, she worked for a short period at McCormick Food Services. Tr. 25. March 30, 2004 is the last date Reid was insured and eligible for disability insurance benefits. Tr. 22, 85.

2.    *Medical Evidence*

Reid was diagnosed with diabetes mellitus at the age of twenty-three and, as a result, suffers from peripheral neuropathy and chronic open-angle glaucoma.  Tr. 67-68.  Reid's other physical ailments include arthropathy and tendonitis in her right shoulder and osteopenia of the right hip.  Tr. 68.  Reid also suffers from depression.  Tr. 484.  She takes various prescription medications to treat her physical and mental illnesses.  R.194-95.  To support her claim for benefits, Reid submitted numerous medical reports from her treating physicians dating September 2003 to April 2008.

a.    *Evidence of physical impairments*

Reid has insulin-dependent diabetes mellitus.  Tr. 297, 371.  She has been hospitalized and treated several times for low blood sugar.  Tr. 265-72.  Reid also suffers from diabetic peripheral neuropathy.  Tr. 122, 371.  In October 2003, Reid underwent testing due to complaints of numbness and tingling in her legs and feet.  Tr. 275.  The electromyogram (EMG) nerve conduction study over Reid's bilateral lower extremity was "suggestive of moderately severe peripheral neuropathy without evidence of denervation."  Tr. 273.  The test results were sent to Reid's primary care physician, Dr. Nitin Sardesai, who has been treating Reid since 2003.  Tr. 273-75, 371.  Subsequent examinations have revealed decreased sensation in her legs.  Tr. 121, 124.  Reid also has a medical history of glaucoma and diabetic retinopathy, which has caused her vision to deteriorate.  Tr. 133, 139, 366, 371.

In addition to her regular visits to Dr. Sardesai, Reid's medical record shows several visits to other doctors for treatment related to pain in her lower extremities,

shoulders, and hips. For instance, Reid saw rheumatologist Dr. Keith Reich for the first time on September 9, 2003. Tr. 311. At that consultation, Reid reported that her left leg went numb after sitting for an hour and a half. Tr. 311. According to Dr. Reich, Reid stated that she felt better when walking, but standing was much more difficult. Tr. 311. Dr. Reich's examination of Reid's left shoulder revealed restriction in internal rotation with evidence of impingement and subacromial bursal tenderness. Tr. 312. An x-ray of Reid's right shoulder taken on September 13, 2003 showed "mild degenerative arthritic changes in the AC joint and glenohumeral joint." Tr. 279. Dr. Reich examined Reid again on December 2, 2003 and noted that her chief complaint was pain in her right shoulder and left hip. Tr. 309. According to Dr. Reich, Reid reported that the pain in her hip ran down her leg, and became worse when sitting and lying on it at night. Tr. 309. Dr. Reich's notes reflect that Reid told him that she had been experiencing this pain for a couple of months and it was getting worse. Tr. 309.

On October 8, 2004, Dr. Reich examined Reid's right shoulder and found restriction in internal rotation to about 80 degrees and external rotation to about 85 degrees, with significant restriction in movement away from her mid-line. Tr. 307. The doctor recommended formal physical therapy on her right shoulder. Tr. 307. In March 2005, Reid's complaints of severe pain in her right shoulder prompted an MRI. Tr. 295. The MRI showed some problems with the tendon and Reid was recommended for further evaluation. Tr. 295. An MRI of Reid's left hip was also done in March 2005. Tr. 294. This MRI showed no evidence of fractures or dislocations and her bone density was normal. Tr. 294.

On August 24, 2005, Dr. Reich saw Reid for a rheumatologic follow-up. Tr. 296. In reporting the results of his exam to Dr. Sardesai, Dr. Reich stated that Reid's "hip problem has been going on now for probably almost two years." Tr. 296. He reported that Reid "appeared uncomfortable" on exam and "[h]er gait was slow." Tr. 296. Dr. Reich referred Reid for an MRI of her hips, which was taken on August 25, 2005. Tr. 288. The MRI showed that the osseous structures were all intact and no periarticular fluid collections were detected. Tr. 288. It also indicated that the supporting soft tissue structures were unremarkable in appearance. Tr. 288. The MRI of Reid's right hip found no significant radiographic abnormalities. Tr. 289. However, one month later, Reid was diagnosed with osteopenia (the abnormal reduction of bone) in her right hip. Tr. 252.

Reid's medical record also contains several reports from Dr. William Dodson, a board certified physician in physical medicine and rehabilitation. Tr. 120-29, 148-150. Dr. Sardesai referred Reid to Dr. Dodson for pain evaluation. Tr. 120. In 2007, Dr. Dodson observed decreased sensation in Reid's lower extremities. Tr. 149. He also noted that "[p]ulses are difficult to palpate in the lower extremities." Tr. 149. Throughout Reid's course of treatment, Dr. Dodson tracked her pain medication and occasionally increased it for better relief. Tr. 125, 423-37.

b.     *Evidence of mental impairments*

According to the documents in the record, Reid's treating physicians began observing her mental distress in 2003. In December 2003, Dr. Reich reported to Dr. Sardesai that he saw Reid in September 2003, shortly before her mother died. Tr. 309.

He noted that, as of December 2003, Reid was "still underneath a fair amount of stress, as her mom has passed away and her mother-in-law is quite ill and is apparently close to death as well." Tr. 309. In October 2004, Dr. Reich reported that Reid was "under a lot of stress in the last year with having the anniversary of her mother's passing away and a sister who was murdered earlier this year." Tr. 306. Dr. Reich observed that "[t]his has really overall been a bad year for her and she seems to be just getting by." Tr. 306.

In May 2007, Dr. Sanker Jayachandran, an adult psychiatrist, evaluated Reid, noting her diagnoses of generalized anxiety disorder, bipolar disorder, and peripheral neuropathy. Tr. 488-91. In October 2007, Dr. Jayachandran completed another psychiatric assessment and treatment plan for Reid. Tr. 480-85. Noting that Reid had been depressed for one year, Dr. Jayachandran diagnosed her with major depressive disorder and prescribed Lexapro. Tr. 484-84. In November 2007, Dr. Jayachandran completed a medical assessment of Reid's ability to do mental work-related activities. Tr. 100-02. He explained that Reid has mood swings, poor concentration, and major depressive disorder. Tr. 101. He stated that Reid "avoids social situations . . . and does not attend consistently to personal grooming." Tr. 101. Overall, Dr. Jayachandran ranked Reid's ability to adjust to a job as very poor. Tr. 100-01.

    c.    *State agency physicians*

Non-examining state agency medical consultants evaluated Reid's file in 2005 and 2006. With respect to Reid's condition, the state agency physicians acknowledged the following allegations: diabetes, rheumatoid arthritis, osteoporosis, neuropathy in

both legs and feet, joint replacement in the second toe of the right foot, cyst on left hip, depression, and glaucoma. Tr. 327. However, the state agency physicians opined that there was not enough medical evidence to establish a disabling condition before March 31, 2004. Tr. 327-28, 357. Similarly, the state agency physicians found insufficient medical evidence to document a severe mental condition before March 31, 2004. Tr. 325, 359.

    3.    *Hearing Testimony*

      a.    *Reid*

At the administrative hearing, Reid testified that between February 1999 and March 2004 she "could hardly move" and experienced severe pain in her feet for years. Tr. 25, 30-31. She explained that her neuropathy was very bad and there were days when she couldn't even stand because "her legs and feet would swell so bad." Tr. 26. She would have to sit down after 30 to 45 minutes of standing. Tr. 28. Reid described the pain as feeling "like somebody has taken a knife and literally is stabbing me in my feet." Tr. 30. She estimated that the pain in her feet started approximately nine to ten years before the hearing. Tr. 41. Reid stated that around 2004 her rheumatologist, Dr. Reich, recommended that she use a cane to help with the pain in her legs and feet, as well as the severe arthritis in her hip. Tr. 36. While using the cane in her right hand, Reid is unable to carry anything with her left. Tr. 36. Reid testified that she uses the cane "most of the time," including around her house. Tr. 36. She stated that she can only spend one to two hours total on her feet each day. Tr. 43-44. Reid testified that

she is often in bed by 7:00 p.m. because her pain worsens in the evening and "there's no reason to stay up." Tr. 44.

Reid testified that she was diagnosed with glaucoma in 2003. Tr. 32. She stated that she has cloudy vision, which gets worse when her sugar is low. Tr. 32. Reid's low sugar episodes have also caused her to pass out, sometimes behind the wheel of a car. Tr. 33. Reid testified that, before March 31, 2004, the paramedics visited her home several times to treat incidents of very low sugar. Tr. 45-46.

Regarding her mental health, Reid testified that she first experienced depression at 22 years old, after her infant son was killed in a car accident. Tr. 41-42. She also recalled being depressed in the late-1990s when she discovered her first husband dead in bed. Tr. 41. Reid testified that her depression worsened after her mother and sister died approximately four years before the hearing. Tr. 40. At the time of the hearing, Reid stated that she was depressed three to four times per week. Tr. 39. She testified that her bipolar disorder causes her to experience manic states where she feels overly elated. Tr. 39.

Reid also testified that she began seeing Drs. Sardesai, Legaspi, Dodson and Reich about five years prior to the hearing. Tr. 44-45. She had only been seeing her psychiatrist, Dr. Jayachandran, for around one year before the hearing. Tr. 45. Reid takes a long list of prescription drugs to treat her physical pain and mental illnesses, including Vicodin, Neurontin, Lexapro, and Xanax. Tr. 30-32. Her medication has caused her to gain weight over the years. Tr. 28.

Reid testified that she was not able to take care of herself before March 31, 2004. Tr. 26. Rather, she needed her husband and his children to help her clean and "get around places." Tr. 26. Reid stated that she could not lift anything heavy around the house, but she could dust. Tr. 27. Reid testified that she could do some grocery shopping by herself, but needed help getting the groceries inside her home. Tr. 34, 37.

b. *Vocational expert*

The ALJ called a vocational expert (VE) to testify at Reid's hearing. Tr. 49. The VE identified Reid's prior work as that of a bartender, which qualifies as light work in the "low end of semi-skilled" range, "offering no real advantage of an unskilled worker." Tr. 51. The VE stated that Reid has no transferable skills. Tr. 51. From there, the ALJ asked a series of hypothetical questions that involved an individual with Reid's age, education, work experience, and skill set. Tr. 51. First, the ALJ asked the VE whether an individual capable of "light work" with the following limitations would be able to perform Reid's past work as a bartender: (1) lift up to 20 pounds occasionally; (2) lift or carry up to 10 pounds frequently; (3) balance frequently; (4) frequently handle objects (gross manipulation); (5) frequently finger (manipulation of items no smaller than the size of a paperclip); (6) occasionally climb ramps or stairs; (7) occasionally stoop, crouch, and kneel; (8) occasionally reach overhead with the right upper extremity; (9) never crawl; (10) never climb ladders, ropes, or scaffolds; (11) avoid concentrated use of moving machinery; and (12) avoid concentrated exposure to unprotected heights. Tr. 51. The VE stated that such a person could perform Reid's past relevant work as a bartender as typically performed in the economy. Tr. 51. The

ALJ revised the hypothetical to include two additional limitations: (1) occasional fine peripheral acuity; and (2) never operate foot controls with either lower extremity. Tr. 52. The VE responded that such a person would be able to perform work as a bartender. Tr. 52. However, when the person's exertional level is reduced from light to sedentary, the VE testified that a person with all of the previous limitations would *not* be able to perform Reid's past work as a bartender as she performed it or as it is customarily performed in the economy. Tr. 52.

Nonetheless, assuming all of the same vocational factors and limitations, the VE testified that there is other work in the regional or national economy that such a person could perform. Tr. 52. Specifically, the VE cited 2,200 to 2,400 bench packer jobs, 1,200 to 1,400 bench assembler positions, as well as work as a general office clerk. Tr. 53. The ALJ added one more limitation to his hypothetical: the person would be allowed to alternate between sitting or standing at will, provided that she is not taken off task more than ten percent of the time. Tr. 53. The VE responded that there is still work in the region or national economy that this person could perform. Tr. 53. Namely, she would still be able to work as a general office clerk, with no reduction in the number of jobs available. Tr. 53. The number of available bench packer positions would be decreased by one-half, leaving approximately 1,200 jobs. Tr. 53-54. Likewise, the bench assembler positions would be reduced to about 1,600 jobs. Tr. 54.

In his next hypothetical, the ALJ further limited the person to simple, routine, and repetitive tasks, in addition to all of the aforementioned restrictions. Tr. 54. The VE testified that the same number of bench packer and bench assembler positions

would still be available to this person; however, it would rule out all jobs as a general office clerk. Tr. 54. Instead, a third job option for this person would be that of a sorter. Tr. 54. The VE testified that there are 1,200 to 1,400 sorter positions available in the regional or national economy. Tr. 54. The VE confirmed that all of the jobs cited in her testimony are consistent with the descriptions provided in the Dictionary of Occupational Titles. Tr. 55. The VE stated that she also relied on the SSA's vocational expert manual and other sources in formulating her answers. Tr. 55.

The VE testified that a person must be able to engage in sustained work activity on a regular and continuing basis for eight hours per day, five days per week, for a 40-hour workweek or an equivalent work schedule, in order to perform work at any exertional level. Tr. 54. Generally, a new employee is limited to five to seven excused absences, and five to seven unexcused absences. Tr. 55. The VE testified that breaks are commonly limited to one 20- to 30-minute lunch break and two 10- to 15-minute breaks, one in the morning and one in the afternoon. Tr. 55. Employees are also permitted momentary breaks to use the restroom each hour. Tr. 55.

On cross-examination, Reid's attorney presented the VE with the mental RFC questionnaire completed by Dr. Jayanchandra on November 13, 2007. Tr. 56. The VE testified that if she were to add this RFC to her analysis, "it would rule out work activity altogether." Tr. 57. Reid's attorney also asked the VE about how an insulin-dependent diabetic's frequent black outs at work would affect her ability to retain a job. Tr. 58. The VE testified that all work activity would be eliminated if her black outs took her off task for more than fifteen percent of the workday. Tr. 58.

At the conclusion of the hearing, Reid's attorney stated that he planned to supplement the medical record, primarily because he did not believe that Dr. Sardesai's "very brief" physical RFC questionnaire "actually expresses [his] full appreciation of [Reid's] limitations." Tr. 57-58.

### 4.    *The ALJ's Decision*

The ALJ concluded that Reid was not disabled at any time from February 9, 1999, the alleged onset date, through March 31, 2004 (the date last insured), because she could perform some sedentary jobs that exist in significant numbers in the national economy. Tr. 73. The ALJ applied the sequential five-step analysis to arrive at his decision. *See* 20 C.F.R. § 404.1520. First, he found that Reid was not engaged in substantial gainful activity at any time before March 31, 2004. Tr. 67. At step two, the ALJ analyzed the medical evidence and determined that her diabetes mellitus, peripheral neuropathy, glaucoma, and shoulder and hip impairments were severe. Tr. 68. At step three, however, the ALJ found that Reid's impairments did not meet or medically equal a listing in 20 C.F.R. § 404, Subpart P, Appendix 1. Tr. 69. In particular, Reid's diabetes mellitus did not meet or medically equal Listing 9.08 and her shoulder problems did not meet or medically equal Listing 1.02. Tr. 69. At step four, the ALJ found that Reid retained the functional capacity to perform sedentary work, with additional modifications, but could not perform her past relevant work. Tr. 72. However, at step five, he concluded that Reid could perform a significant number of other jobs in the national economy. Tr. 72-73.

## II.

Judicial review of the SSA's decisions is governed by 42 U.S.C. § 405(g); *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). When, as here, an ALJ's decision constitutes the final action of the SSA, the Court's task is to examine the decision "to determine whether substantial evidence supports it and whether the ALJ applied the proper legal criteria." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). The Court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). However, the Court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 2001). Finally, while "judicial review of the decisions of administrative agencies is deferential, it is not abject" and this Court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (internal citations omitted).

## III.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. *See* 42 U.S.C. § 423(d). The claimant must show that she is "disabled" due to her inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

13

§ 423(d)(1)(A). The claimant must also establish that she was disabled on or before her date last insured. § 423(a)(1)(A), (c)(1); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

A claim of disability is evaluated under a sequential five-step analysis. *See* 20 C.F.R. § 404.1520; *Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004). In the first step, the ALJ considers whether the claimant is working and whether such work is "substantial gainful activity." § 404.1520(b). If the claimant is not working, the ALJ will address step two: whether the claimant has an impairment or combination of impairments that is "severe." § 404.1520(c). At step three, the ALJ determines whether the claimant's severe impairment meets or medically equals any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. If the impairment meets or equals one of the listed impairments, then the applicant is conclusively disabled. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). If the impairment does not meet or equal a listed impairment, the evaluation continues to an assessment of the claimant's residual functional capacity (RFC). *Id.* Once the claimant's RFC is determined, the ALJ will evaluate whether she can perform her past relevant work. If she is unable to perform past relevant work, the analysis proceeds to the fifth and final step: whether the claimant is able to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof regarding her disabling conditions at steps one through four. § 404.1514; *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991). At step five, the burden shifts to the Commissioner to prove that a significant number of jobs are

14

available in the national economy for an employee with the claimant's ability. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

On appeal, Reid challenges the ALJ's determination that she was not disabled from the period of February 8, 1999, to March 31, 2004. Specifically, she argues that the ALJ committed various legal errors at steps three, four, and five of the analysis.

### A.

*The ALJ's Step Three Finding is Supported by Substantial Evidence.*

First, Reid argues that the ALJ's finding that her diabetes mellitus does not meet or equal Listing 9.08A is not supported by the substantial evidence. R. 20 ("Pl.'s Br.") at 9. Specifically, she contends that the ALJ did not consider any evidence favorable to Reid and did not provide a sufficient analysis of his finding. Pl.'s Br. at 9-11. The Commissioner takes the opposite position and argues that the ALJ's step three determination is supported by substantial evidence and must be upheld. R. 24 ("Def.'s Resp.") at 3-4.

At step three, the ALJ must determine whether Reid's severe impairments meet or medically equal the criteria of a listed impairment. *See Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). Reid has the burden of showing that her impairments, alone or in combination, meet or medically equal all of the requirements of a listing. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (in order to match a listing, the claimant must show that his impairment meets *all* of the specified medical criteria).

In Reid's case, the ALJ found that "[n]o treating or examining physician has indicated findings that would satisfy the requirements of any listed impairment." Tr. 69. The ALJ stated that he specifically considered Listing 9.08 (diabetes mellitus) and Listing 1.02 (major dysfunction of a joint). Tr. 69. The ALJ relied on a state agency physician that reviewed Reid's file and concluded that, based on the medical evidence available, she was not disabled. Tr. 327-28. A second state agency physician confirmed the initial December 22, 2005 assessment. Tr. 358-59. Both physicians filled out disability determination and transmittal forms and stated that Reid was not disabled through March 31, 2004. Tr. 60-61. The disability determination and transmittal forms "conclusively establish that 'consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review.'" *Scheck*, 357 F.3d at 700(quoting *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1990)). The ALJ may rely on the opinion of these medical experts. *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990). Thus, the Court agrees with the SSA that the ALJ adequately considered Reid's step three argument and that substantial evidence supports the finding.

The ALJ did not ignore the evidence that potentially supported Reid's claim. *Cf. Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (remand required when ALJ failed to evaluate any evidence that potentially supported claimant's disability). It is clear from the record that the ALJ reviewed the favorable evidence offered by Reid, including the October 13, 2003 EMG and clinical opinions from Reid's treating physicians. Tr. 67-71; *Rice*, 384 F.3d at 370 (reading the ALJ's decision as a whole).

However, none of the opinions of Reid's treating physicians address the question of medical equivalency. *See Scheck*, 357 F.3d at 700; *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988); *see also Sims*, 309 F.3d at 429. Reid argues that she qualifies under Listing 9.08A based on her October 2003 EMG results and the opinions from her physicians that she has diabetic peripheral neuropathy, yet none of this evidence demonstrates that her symptoms met or equaled in severity the criteria under Listing 9.08A. None of her physicians went "so far as to render an opinion on the issue in question – medical equivalency." *See Steward*, 858 F.2d at 1299. Thus, it was unnecessary for the ALJ to articulate his reasons for accepting the state agency physicians' opinions, as they were not contradicted by any other evidence in the record. *Scheck*, 357 F.3d at 701.

Nor was the ALJ's analysis at step three perfunctory. "[A]n ALJ need not address every piece of evidence in his decision . . . [he] need only build 'a bridge from the evidence to his conclusion.'" *Sims*, 309 F.3d at 429 (quoting *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000)). Here, the ALJ specified that he considered Listings 9.08 and 1.02, but the evidence did not demonstrate that all of the criteria for either listing was satisfied. Tr. 69. This is not a case where the ALJ discussed only evidence that favors his decision. *See Herron v. Shalala*,19 F.3d 329, 333 (7th Cir. 1994). To the contrary, the ALJ discussed Reid's impairments in detail and cited to many of the medical reports she provided. *See Rice*, 384 F.3d at 369-70.

Finally, Reid's argument that the ALJ was required to obtain testimony from a medical expert is without merit. It is true that Reid produced additional medical

evidence after the state agency physicians submitted their reports. *See* Tr. 376-522.

However, under the relevant Social Security Ruling, SSR 96-6p, an ALJ is required to obtain an updated expert opinion only when he believes that the medical evidence "may change the State agency medical or psychological consultant's finding that the impairment is not equivalent in severity to any impairment in the Listing of Impairments." Here, the ALJ indicated that he considered the additional evidence from Reid in reaching his decision. Tr. 65. However, the new evidence from Reid's treating doctors related to her already-evaluated impairments, and did not provide an opinion on medical equivalence. In light of the ALJ's explanation of the step-three finding, the Court affirms the ALJ's finding with respect to step three.

## B.

*The ALJ's RFC Determination is Flawed.*

Before proceeding to step four of the analysis, an ALJ must determine the claimant's residual functional capacity (RFC) based on all of the relevant medical and other evidence. 20 C.F.R. § 404.1520(e) ("Determining a claimant's RFC is a legal decision reserved to the Commissioner."). The claimant's RFC is the maximum that she can still do despite her mental and physical impairments. § 404.1545(a)(1). In determining what a claimant can do despite her limitations, the ALJ must consider the entire record, including all relevant medical and nonmedical evidence, as well as the claimant's own statements of what she is able to do or unable to do. *Id.* The ALJ then uses the RFC to determine, at steps four and five, whether the claimant can return to her past work or to different available work. § 404.1545(a)(5).

In Reid's case, the ALJ determined that she has the RFC to perform "sedentary work" as defined in 20 C.F.R. § 404.1567(a), allowing her the option to alternatively sit or stand at her choosing, provided that she is not taken off task more than ten percent of the work period. Tr. 69. According to the SSA regulations,

> [s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). In addition to the sitting/standing modification above, the ALJ further limited Reid's sedentary RFC by holding that she can never (1) climb ladders, ropes or scaffolds; (2) crawl; or (3) operate foot controls. Tr. 69. She must avoid concentrated exposure to unprotected heights and the use of moving machinery. Tr. 69. The ALJ found that Reid can only occasionally (1) climb ramps or stairs; (2) stoop; (3) kneel; (4) crouch; and (5) reach overhead with the right dominant upper extremity. Tr. 69. Her work is also limited to occupations requiring only occasional peripheral acuity. Tr. 69. Finally, the ALJ found that Reid can (1) frequently balance; (2) handle objects (gross manipulation); and (3) finger (fine manipulations). Tr. 69.

It is true that the ALJ stated that he considered all of the evidence of record, including Reid's statements, in making his RFC determination. Tr. 69. However, Reid argues that the ALJ's analysis is flawed for two reasons. First, she contends that the ALJ failed to adequately explain his adverse credibility finding. Pl.'s Br. at 11.

Second, she argues that the ALJ failed to properly weigh her treating physicians' opinions. The Court agrees with Reid on both counts.

1.  *The ALJ Failed to Adequately Explain the Credibility Assessment.*

In evaluating the credibility of a claimant's allegations of pain or other disabling symptoms, the ALJ must follow a two-step process. *See* SSR 96-7p. First, the ALJ must determine whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce the symptoms. If not, the symptoms cannot be found to affect her ability to work. Second, if the ALJ finds that the claimant has an impairment that could produce the alleged symptoms, the ALJ must determine the extent to which they limit her ability to work. *Id.* The ALJ cannot disregard a claimant's subjective statements about disabling pain solely because they are not substantiated by objective medical evidence. *Id.*; 20 C.F.R. § 404.1529(c)(2); *Clifford v. Apfel*, 227 F.3d 863, 871-72 (7th Cir. 2000). Instead, an ALJ should compare the consistency of a claimant's statements against objective information in the medical record. SSA Ruling 96-7p.

An ALJ's credibility determination must be upheld if it is not "patently wrong," but – significantly – the ALJ must give specific reasons for his finding that are supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (ALJ must provide specific reasons for credibility determination, grounded in the evidence and articulated in the decision). In determining credibility, an ALJ must consider several factors, including the claimant's testimony and daily activities, her level of pain or symptoms,

aggravating factors, pain medication taken, treatment, and limitations. *See Herron*, 19 F.3d at 334; 20 C.F.R. § 404.1529(c); SSR 97-6p. The regulations emphasize how important it is for the ALJ to explain the reasons for his credibility finding. *See* SSR 96-7p; *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006).

In this case, the ALJ found Reid "not fully credible" and attributed "limited weight" to her subjective symptoms. Tr. 70. Reid argues that the ALJ's credibility finding is improper because he did not provide specific reasons for his decision. Pl.'s Br. at 13. She contends that the only information provided was boilerplate and insufficient to support the ALJ's finding without further explanation. Pl.'s Br. at 12-13. Reid also claims that the ALJ's analysis of her daily activities is flawed because he failed to explain how these activities undermine her allegations of disability or equate to the ability to work full-time. R. 25 ("Pl.'s Reply Br.") at 6. In response, the SSA asserts that the ALJ's credibility finding should be upheld as "not patently wrong." Def.'s Resp. at 9-11. The SSA alleges that the ALJ's decision is not completely devoid of explanation or support and that the ALJ's analysis of Reid's daily activities was proper. Def.'s Resp. at 10-11.

In his decision denying benefits, the ALJ wrote that Reid's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely plausible to the extent alleged." Tr. 70. In more than one instance, the ALJ summarily found that Reid's testimony "is not supported by the objective medical evidence of record." Tr. 70-71.

21

But the ALJ did not specify which parts of Reid's testimony he does not believe and what, if anything, he credits. *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Rather, the ALJ paraphrased Reid's testimony regarding the amount of pain she experienced before her DLI and concluded this testimony was not plausible. Tr. 70. It is impossible to decipher which symptoms he believed. *See id.* The ALJ stated that he attributed "limited weight" to Reid's testimony, but the reasons for that decision were not specified. *See* SSR 96-7p ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."). In short, the Court is unable to ascertain *why* the ALJ found Reid to lack credibility, and agrees with Reid that the credibility determination is conclusory and insufficiently explained. *See Parker*, 597 F.3d at 922; *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003).

Similarly, the ALJ's recitation of Reid's daily activities does not substitute for the reasoned analysis required under SSR 96-7p. Although the ALJ briefly described Reid's testimony about her daily activities, the ALJ failed to explain whether these activities were consistent or inconsistent with the pain and limitations she claimed. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, a claimant's ability to conduct limited daily activities does not, in itself, contradict a claim of disabling pain. *See id.* at 558. It is not clear how Reid's ability to conduct certain household tasks, watch television, and pay bills is inconsistent with her reports of pain in her feet

and right shoulder. Tr. 70-71. Moreover, the ALJ inaccurately recounted Reid's testimony about her daily activities. For example, the ALJ stated that Reid is able to shop for groceries. Tr. 70-71. However, Reid testified that she would only go to the grocery store by herself "to pick up a gallon of milk or a loaf of bread or something that's light" and needed help to complete the task. Tr. 34-35. In bringing the milk home, she would roll the shopping cart right up to the trunk and deposit the milk, and then her husband or neighbor would get the milk from the car and bring it into her house. Tr. 36-37. The ALJ also stated that Reid is able to take care of her personal needs. Tr. 70. However, Reid testified that she was generally *not* able to take care of herself without help from her husband or his kids. Tr. 26. This is consistent with the daily activities questionnaire she completed in October 2005, which states that arthritis in her shoulders and hands affected her ability to bathe, dress, and do her hair. Tr. 204. Another example is the ALJ's statement that Reid is able to "do light household chores and prepare meals." Tr. 70. At the hearing, Reid testified that she could dust, but had to sit down after only 30 to 45 minutes of standing. Tr. 27-28. Also, it is not clear from the record that Reid actually prepares meals on her own. Her daily activities questionnaire, which is not very detailed, answers "both" to the question of who cooks her meals, which likely implies that her husband assists with this task as well. Tr. 203. Reid was not asked about meal preparation at the hearing. In short, the ALJ failed to explain how Reid's daily activities are inconsistent with her testimony and his decision does not mention the ways in which Reid limited her activities or why the ALJ disregarded those limitations. *See Craft*, 539 F.3d at 680.

23

Moreover, in assessing Reid's credibility, the ALJ does not mention the laundry list of prescription medications she takes, many of which specifically treat pain. At the time of the hearing, Reid reported taking Narco (previously Vicodin, for pain), Lexapro (depression), Xanax (depression), and eye drops for her glaucoma. Tr. 31-32. A review of Reid's medical records show other pain medications, including Ultram, Neurontin, and Kadian. Tr. 312, 436. It is not clear from the ALJ's decision whether he considered "[t]he type, dosage, effectiveness, and side effects of any medication" Reid took "to alleviate [her] pain or other symptoms." 20 C.F.R. § 404.1529(c)(3)(iv).

The ALJ's credibility determination in Reid's case is crucial, particularly because her disability claim turns in large part on subjective complaints concerning pain. *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011). The regulations also recognize that "[p]ain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone; *e.g.*, someone with a low back disorder may be fully capable of the physical demands consistent with those of sustained medium work activity, but another person with the same disorder, because of pain, may not be capable of more than the physical demands consistent with those of light work activity on a sustained basis." 20 C.F.R. § 404.1545(e).

On remand, the ALJ must re-examine the alleged inconsistencies between Reid's testimony and the medical record, explain the nature of the inconsistencies, and address the relevant evidence in the record in light of the discussion above.

2.      *The ALJ Erred in Discounting the Opinions of Treating Physicians.*

The ALJ has the responsibility to develop a complete medical history. 20 C.F.R. § 404.1512(d). Under the regulations, an ALJ must determine the weight to give a treating physician's opinion. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). A treating physician's medical opinion must be given controlling weight if two conditions are met: (1) it is supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) it is not inconsistent with substantial evidence in the record. *Id.*; *Elder v. Astrue*, 529 F.3d 408, 415-46 (7th Cir. 2008). If an ALJ decides to reject a treating physician's opinion, he must apply the factors listed in the regulations and "give a good reason" for his decision. *See Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (citing § 404.1527(d)(2)).

Reid argues that the ALJ improperly dismissed her treating physicians' opinions because they post-dated her date last insured, March 31, 2004. Pl.'s Br. at 14-15. She contends that the ALJ failed to weigh the opinions in accordance with § 404.1527(d) and ignored his responsibility to recontact her treating physician, Dr. Sardesai, regarding his report dated April 21, 2008. Pl.'s Br. at 14-15. The SSA's position is that it was Reid's burden to prove that she is disabled and, thus, she should have submitted medical opinions that clearly related back to before March 31, 2004. Def.'s Resp. at 12-13. The SSA argues that the ALJ had adequate evidence to find Reid not disabled and, even assuming that Dr. Sardesai's April 21, 2008 evaluation related back, it would not alter the residual functional capacity finding. Def.'s Resp. at 12-13.

With regard to opinion evidence, the ALJ found that "the record does not contain any opinions from treating or examining physicians which identify any subjective or objective medical findings to support a conclusion indicating that the claimant is disabled by her date last insured or even has limitations greater than those determined in this decision." Tr. 71. However, Dr. Sardesai assessed Reid's ability to do physical work related activities and concluded that her peripheral neuropathy precludes her from standing and walking more than one hour *total* out of an eight-hour work day. Tr. 519. Dr. Sardesai also found that, due to her peripheral neuropathy, Reid can only stand and walk without interruption for thirty minutes total out of an eight-hour work day. Tr. 519. According to Dr. Sardesai, Reid's ability to sit for long periods of time is also limited: she can only sit for a maximum of two hours *total* (with or without interruptions) in an eight-hour work day. Tr. 520. He stated that Reid's ability to feel is affected by her neuropathy and she experiences "constant pain" in her feet. Tr. 520-21. SSR 83-10 elaborates on the activities needed to carry out the requirement of sedentary work. "Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SR 83-10. Thus, even if Reid had the option to sit or stand at will, Dr. Sardesai's medical opinion suggests that she is not capable of performing sedentary work.

The ALJ referenced Dr. Sardesai's opinion in discussing the medical evidence, but stated that "[i]t is unclear what time period he is referring to as the form is dated

well after the claimant's date last insured." Tr. 70. The ALJ did not apply the factors listed in the regulations in order to determine the weight to give Dr. Sardesai's opinion about Reid's ability to work. *See* § 404.1527(d)(2)-(6). The ALJ did not explain why he did not consider Dr. Sardesai's opinion. The ALJ recognized that the time period was unclear, but that was the extent of the explanation. The ALJ had an obligation to "seek additional evidence or clarification from [Reid's] medical source when the report . . . contains a conflict or ambiguity that must be resolved" or lacks all the necessary information. § 404.1512(e)(1); *see also* SSR 96-5p ("For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us."). The fact that the ALJ indicated that the time period Dr. Sardesai's report addressed was "unclear" reveals the presence of an ambiguity that the ALJ was required to resolve. *See* § 404.1512(e)(1); *see also Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (holding that the ALJ should have contacted the plaintiff's doctor and asked for "more detail regarding the frequency" of plaintiff's seizures). Had the ALJ done so, Dr. Sardesai could have readily clarified this issue.

Moreover, Dr. Sardesai indicated in a letter dated July 27, 2006 that he treated Reid "for the past three years" and her severe diabetic peripheral neuropathy has developed "over a period of time." Tr. 371. Not only does this opinion support Reid's testimony, it supports the possibility that Dr. Sardesai's questionnaire might have been referring to Reid's condition before March 31, 2004. Dr. Sardesai also opines in

the letter that Reid is disabled. Tr. 371. Either way, in light of Dr. Sardesai's history of regularly treating Reid for physical impairments, the ALJ should have sought clarification regarding the April 21, 2008 questionnaire before completely disregarding it.

## C.

*The ALJ Used a Flawed RFC Assessment at Step Five.*

After assessing a claimant's RFC based on all of the relevant evidence, the RFC is used at steps four and five to determine whether she is disabled. § 404.1545(a)(5). The RFC assessment is a tool to assess "what work-related activities the claimant can perform despite her limitations" and assists in determining whether she can perform past relevant work or other work. *Young v. Barhnart*, 362 F.3d 995, 1000 (7th Cir. 2004). When determining a claimant's ability to meet the demands of work, the ALJ must consider "the testimony of claimant as well as supplemental sources of information, such as the United States Department of Labor's Dictionary of Occupational Titles." *Schroeter v. Sullivan*, 977 F.2d 391, 394 (7th Cir. 1992). Regarding the latter, an ALJ may rely on a vocational expert (VE) so long as the VE offers reliable testimony. For a VE's testimony to be reliable, the hypothetical questions posed to the VE must include all limitations supported by medical evidence in the record. *See Young*, 362 F.3d at 1003; *Herron*, 19 F.3d at 337. However, where the VE had the opportunity to learn of the claimant's limitations through an independent review of the medical records or through questioning at the hearing, the

VE may offer reliable testimony even if the hypothetical did not include every limitation. *Id.*

Because the Court has already determined that the ALJ's RFC determination must be vacated, a fresh analysis of Reid's ability to engage in jobs that exist in significant numbers in the national economy may be warranted. The ALJ will likely need to ask the VE new hypothetical questions covering the new limitations, if any, that Reid is found to have. *See Young*, 362 F.3d at 1004-05 (noting that when an RFC is deficient, the hypothetical questions an ALJ poses to a VE are generally deficient as well; accordingly the ALJ's conclusion that a claimant can adjust to other work in the national or regional economy is likewise invalid). Thus, on remand, the ALJ should revisit the reliance on the VE's testimony based on any changes to the RFC determination and, if necessary, obtain updated VE testimony.

For completion's sake, and to provide guidance on remand, the Court will address Reid's remaining step five arguments. Specifically, Reid argues that the ALJ's step five determination was flawed for two reasons: (1) the ALJ failed to incorporate all of Reid's physical and mental limitations in the hypothetical question posed to the VE; and (2) the ALJ ignored apparent conflicts between the VE's testimony and the Dictionary of Occupational Titles (DOT).

1.   *Mental Limitations*

Reid argues that the ALJ's step five determination failed to include her mental limitations in the hypothetical posed to the VE. Pl.'s Br. at 16-17. This argument, however, does not account for 20 C.F.R. § 404.1545(a)(2), and is presented in the wrong

context. In determining a claimant's RFC, the ALJ is required to consider all of the claimant's medically determinable impairments, including those that are not severe. 20 C.F.R. § 404.1545(a). But an ALJ need not assess residual functional capacity in light of impairments that are *not* medically determinable. In Reid's case, the ALJ concluded at step two that Reid's impairments were *not* medically determinable. Tr. 68. Therefore, the ALJ was not required to incorporate Reid's depression into his RFC assessment or, later, at steps four and five.

Thus, it appears that Reid's true argument is that the ALJ's step two determination (namely, that she does not have a medically determinable mental impairment) is not supported by substantial evidence. Reid argues that the ALJ improperly "discredited [her] testimony regarding her depression and found she did not suffer from a severe mental impairment prior to her DLI, which was improperly based on his own lay opinion." Pl.'s Br. at 17. Reid also contends that the ALJ should have requested treatment records from unknown physicians who allegedly treated Reid in the 1980s and 1990s. *Id.* She alleges that the ALJ's failure to request these records is "particularly disconcerting" because these records could help him determine whether Reid's current depression related back to years before March 31, 2004. The SSA's cursory response, which was likely caused by the convoluted manner in which Reid presented this argument, is that "the ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." Def.'s Resp. at 14 (quoting *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007)). In other words, the SSA's position is that the ALJ considered Reid's testimony, found her "not

fully credible," and was justified in excluding it from his step five analysis. Def.'s Resp. at 13-14.

Turning to step two, the ALJ rejected Reid's allegation of a mental impairment because there was no evidence of record that Reid experienced depression prior to March 31, 2004. Tr. 68. The ALJ also found that although Reid "has made statements regarding her condition *at present*, the record does not contain any medical information with evidence of signs or laboratory studies establishing a medically determinable impairment that would have interfered with her ability to perform basic work activities as of her date last insured." Tr. 68 (emphasis added).

The finding does not comport with the evidence in the record. At the hearing, Reid testified that she was first treated for depression after her infant son was killed in a car accident. Tr. 41. She stated that she experienced depression in the late 1990s. Tr. 41. In the 1998-1999 time-frame, Reid testified that finding her husband dead in bed resulted in further psychological problems. Tr. 41. In October 2003, Reid's mother passed away and her depression worsened. Tr. 40. She began taking Xanax and other anti-depressants in 2004. Tr. 40.

While the ALJ found "no documented record of complaints of symptoms or evaluation for a mental health disorder prior to the date last insured," there are documents in the record that show Reid reported symptoms to her treating physicians before March 30, 2004. Tr. 68. For instance, Reid's rheumatologist, Dr. Reich, examined Reid on September 9, 2003. Tr. 311-12. In reporting his findings to Reid's primary care physician, Dr. Sardesai, Dr. Reich stated that he would like Reid to go to

physical therapy; "however at this time with the stress of her mother's illness, I think it would be fruitless until things calm down in her family." Tr. 312. After a follow-up visit on December 2, 2003, Dr. Reich reported that Reid "is still underneath a fair amount of stress, as her mom has passed away and her mother-in-law is quite ill and is apparently close to death as well." Tr. 309. Reid's emotional problems influenced Dr. Reich to postpone Reid's physical therapy for her shoulder and hip until "after the year, when things have calmed down in her life." Tr. 310. These records, combined with Reid's testimony about her past depression, demonstrate that the ALJ should have at least considered this evidence before concluding that Reid did not have a mental impairment. *See* SSR 96-7p ("the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment").

The administrative decision does not mention Reid's testimony regarding her past episodes of depression. The ALJ found that her testimony shows that she "clearly . . . appears to be currently experiencing depression," but that summary of her testimony is incomplete. Tr. 68. Thus, it is unclear whether the ALJ found Reid's testimony about her past depression not credible or simply overlooked it altogether. In the decision, the ALJ also stated that "a statement of symptoms alone is not sufficient to establish that there is a physical or mental impairment." Tr. 68. This implies that the ALJ may have evaluated some of Reid's statements of symptoms, but

the Court is left wondering which statements, if any, he considered. It is also unclear whether the ALJ considered the psychiatric evaluations filled out by the state agency physicians before arriving at his conclusion. The initial report concluded that there was insufficient evidence to find that there was a severe mental impairment before March 31, 2004, but does not specify whether Reid had a nonsevere impairment. Tr. 325.

The ALJ's failure to explain the step two determination regarding Reid's alleged mental impairment prevents this Court from following his reasoning and raises doubt that he considered all of the relevant evidence before finding Reid was not mentally impaired. *Godbey v. Apfel*, 238 F.3d 803, 807-08 (7th Cir. 2000). Indeed, there may be substantial evidence in the record to support the ALJ's finding that Reid was not mentally impaired before March 31, 2004, but this Court is unable to uphold his decision when it fails to build a logical bridge between the facts of the case and the outcome. *See Parker*, 597 F.3d at 921; *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (an ALJ must "sufficiently articulate his assessment of the evidence to assure us that [he] considered the important evidence . . . [and to enable] us to trace the path of [his] reasoning") (internal quotation omitted)).

Accordingly, the ALJ's finding that Reid did not have a mental impairment before March 31, 2004 is not supported by substantial evidence. On remand, the ALJ should consider Reid's testimony as to her mental health impairment and determine any appropriate mental limitations. Any such limitations should be included in the ALJ's RFC assessment and presented to the VE.

2.    *Apparent Conflicts in Jobs Evidence*

Lastly, Reid complains that the ALJ did not follow SSR 00-4p because he failed to inquire into and resolve apparent conflicts between the VE's testimony and the jobs she cited from the DOT. Pl.'s Br. at 18-19. Specifically, Reid claims that the bench packer, general office clerk, and bench assembler positions are all "light work" jobs that she is unable to perform due to her "sedentary" RFC. Pl.'s Br. at 18-19. The SSA responds that the ALJ fulfilled his responsibility to inquire by asking the VE specifically to point out any inconsistencies between her testimony and the DOT. Def.'s Resp. at 14; *see Nicholson v. Astrue*, 341 Fed. Appx. 248, 254 (7th Cir. 2009) (ALJ satisfies duty under SSR 00-4p when VE reports no inconsistencies and claimant fails to identify any at the hearing). The SSA also contends that any error by the ALJ in failing to obtain an explanation about the exertional levels required for the bench packer, general office clerk, and bench assembler jobs is harmless because the VE's testimony demonstrates that 1,100 bench packer jobs exist. Def.'s Resp. at 16-17.

As to this specific point, the ALJ was entitled to rely on the VE's testimony. Reid's attorney did not raise any discrepancies between the VE's testimony and the DOT at the hearing. "An ALJ is not obliged to reopen the record" to address discrepancies identified after the hearing. *Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir. 2002). Reid's failure "to identify the conflicts at the time of the hearing is not without consequence." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008). Her attorney did not challenge the VE's testimony or elicit any statements that seriously call into question the reliability of the VE's conclusions regarding work that Reid is

34

able to perform. *See id.* at 464. Of course, additional VE testimony may be required depending on whether the ALJ on remand alters the RFC findings after reconsideration of the matters discussed above.

## IV.

Although the denial of benefits was inadequately explained, the Court denies Reid's request for an outright reversal of the ALJ's decision and an award of benefits without remanding for a rehearing, because the record does not compel a finding that Reid is disabled under the Act. *See Boiles v. Barnhart*, 395 F.3d 421, 427 (7th Cir. 2005). Rather, the Court vacates and remands this case back to the ALJ for further consideration consistent with this opinion.

ENTERED:

_____
Honorable Edmond E. Chang
United States District Judge

Date: April 19, 2011